**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| CASTLE EQUIPMENT COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendant/Third Party Plaintiff.<br><br>v.<br><br>ANTHONY F. ROSCITI, JR.<br><br>Third Party Defendant. | Civil Action No. 07-98S<br>(consolidated) |

**MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES FIRE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

In this consolidated action, plaintiff, Castle Equipment Company ("Castle"), is seeking to recover certain alleged damages under payment bonds issued by United States Fire Insurance Company ("U.S. Fire"), as surety, on behalf of its principal, South Shore Utility Contractors Inc. ("South Shore"), in connection with public construction projects located in Rhode Island and Massachusetts. Castle alleges that it rented certain equipment to South Shore on the projects and that South Shore failed to pay for the equipment provided. U.S. Fire submits this Memorandum of Law in support of its motion for summary judgment on the claims asserted by Castle on the ground that Castle is not a proper claimant under the payment bonds because Castle is majority-owned and controlled by Anthony F. Rosciti, Jr. ("Rosciti"), the same individual who owns and controls South Shore, the bond principal, and is also a personal indemnitor to U.S. Fire.

The following facts are undisputed: (1) Rosciti was an owner, President and Treasurer of South Shore and in that capacity controlled the business operations of South Shore; (2) Rosciti is the 70% majority-owner, President and Treasurer of Castle and in this capacity controls the business operations of Castle; (3) South Shore, controlled by Rosciti, did not pay Castle for equipment rental; (4) Castle, controlled by Rosciti, continued to rent equipment to South Shore without receiving payment for equipment rental; (5) Rosciti, as President and Treasurer of Castle, submitted the payment bond claims to U.S. Fire on behalf of Castle for the unpaid equipment rental; and (6) Rosciti, as a personal indemnitor to U.S. Fire in connection with the bonds issued to South Shore, is obligated to indemnify U.S. Fire for any payments that U.S. Fire may be required to make to Castle for the equipment rental unpaid by South Shore.

Based on these undisputed facts, Rosciti's common ownership and control of both Castle and South Shore, and Rosciti's indemnity obligations to U.S. Fire, it is clear that Castle would

not be permitted to recover against U.S. Fire under the federal Miller Act statute governing payment bonds on federal construction projects. Accordingly, the narrow legal issue before this Court is whether, under these undisputed facts, the states of Rhode Island and Massachusetts would adopt the Miller Act precedent and deny coverage under a payment bond to a claimant that is majority-owned and controlled by the same individual who owns and controls the principal, and is also an indemnitor to the payment bond surety. Because both the Rhode Island and Massachusetts public works bonding statutes are modeled after the Miller Act, and the courts of those states look to the Miller Act for guidance, U.S. Fire submits that courts in Rhode Island and Massachusetts would adopt the Miller Act precedent on this issue in order to prevent the obvious fraud, circuity of action and inequity that such claims present. Accordingly, it is respectfully requested that the Court enter summary judgment in favor of U.S. Fire dismissing Castle's claims with prejudice.

## STATEMENT OF FACTS

### I. SOUTH SHORE UTILITY CONTRACTORS, INC.

On June 21, 2004, in consideration for U.S. Fire, as surety, to issue bonds on behalf of South Shore Utility Contractors, Inc. ("South Shore"), Anthony F. Rosciti, Jr. ("Rosciti"), among others, individually and on behalf of South Shore, executed a General Agreement of Indemnity (the "Indemnity Agreement") in favor of U.S. Fire. *See* Affidavit of Adam R. Schwartz, Esq. ("Schwartz Aff.") ¶ 3, Ex. A; *see also* Schwartz Aff. ¶ 4, Ex. B at 11 (Rosciti admitting execution of the Indemnity Agreement). Under the Indemnity Agreement, Rosciti agreed, among other things, to indemnify U.S. Fire for all losses incurred by U.S. Fire as a result of issuing bonds on behalf of South Shore. *See* Schwartz Aff. ¶ 3, Ex. A at ¶ 2; *see also* Schwartz Aff. ¶ 5, Ex. C. at 52:9-21 (Rosciti admitting obligation to indemnify U.S. Fire for losses incurred under bonds issued on behalf of South Shore).

Rosciti was the President, Treasurer and fifty percent (50%) owner of South Shore and in this capacity controlled the business operations of South Shore, oversaw the day-to-day operations of South Shore and oversaw the projects being performed by South Shore. *See* Schwartz Aff., Ex. B at 5; *see also* Deposition Transcript of Rosciti, Schwartz Aff. ¶ 5, Ex. C. at 22:17-22, 60:18-20. Rosciti's cousin, Henry Rosciti, Jr., was the Vice President and the other fifty percent (50%) owner of South Shore; however, Henry Rosciti, Jr.'s role was limited to driving a truck for South Shore. *See* Deposition Transcript of Henry Rosciti, Jr., Schwartz Aff. ¶ 6, Ex. D at 8:13-18, 10:5-12.

Following the execution of the Indemnity Agreement, U.S. Fire, as surety, issued, among others, a Construction Payment Bond, bearing bond no. 6102466659 ("Earle Street Bond"), on behalf of South Shore, as principal, and in favor of the City of New Bedford, Massachusetts, as

obligee, in connection with a project known as the "Earle Street Sewer Separation" (the "Earle Street Project"). *See* Schwartz Aff. ¶ 5, Ex. C. at 52:22-24 (Rosciti admitting issuance of Earle Street Bond). U.S. Fire also issued, among others, a Labor and Materials Bond, bearing bond no. 6102446391 ("Glendale Village Bond"), on behalf of South Shore, as principal, and in favor of the Town of Burrilville, Rhode Island, as obligee, in connection with a project known as the "Glendale Village Sanitary Sewers and Appurtenant Work" (the "Glendale Village Project"). *See* Schwartz Aff. ¶ 5, Ex. C. at 52:25, 53:1-2 (admitting issuance of Glendale Village Bond).

South Shore was placed into state court receivership in Rhode Island in April 2006. *See* Schwartz Aff. ¶ 4, Ex. B at 5. U.S. Fire has obtained an Order in the receivership proceeding approving its claim in the amount of $2,355,373.10 for losses incurred by U.S. Fire under performance and payment bonds issued on behalf of South Shore, including the Earle Street Bond and Glendale Village Bond. *See* Schwartz Aff. ¶ 7, Ex. E. In a separate action commenced by U.S. Fire against Rosciti and others under the Indemnity Agreement, U.S. Fire and Rosciti entered into a Consent Order dated March 14, 2008, whereby Rosciti granted U.S. Fire certain pre-judgment attachments, including a pre-judgment attachment of Rosciti's right, title and/or interest in Castle. *See* Schwartz Aff. ¶ 8, Ex. F.

## II. CASTLE EQUIPMENT COMPANY

Castle is a heavy equipment sales and supply company. *See* Schwartz Aff. ¶ 5, Ex. C at 30:9-10. In addition to Rosciti's role as President and Treasurer of South Shore, Rosciti is also the President, Treasurer and seventy percent (70%) majority-owner of Castle. *See* Schwartz Aff. ¶ 4, Ex. B at 4-5; *see also* Schwartz Aff. ¶ 5, Ex. C at 29:7-23. In this capacity, Rosciti headed and controlled the business operations of Castle and also conducted sales, leasing and rental

activities on an as needed basis. *See* Schwartz Aff. ¶ 4, Ex. B at 4-5; *see also* Schwartz Aff. ¶ 5, Ex. C. at 32:10-25, 33:1-5, 60:21-23.

## III. CLAIMS BY CASTLE UNDER EARLE STREET BOND AND GLENDALE VILLAGE BOND

Castle allegedly rented equipment to South Shore on, among other projects, the Earle Street Project and the Glendale Village Project. *See* Schwartz Aff. ¶ 5, Ex. C at 53:3-5. In this consolidated action, Castle alleges that South Shore failed to pay Castle for the equipment, and, therefore, Castle is seeking to recover in excess of $300,000 from U.S. Fire under the Earle Street Bond and the Glendale Village Bond. *See* Schwartz Aff. ¶¶ 10-11, Ex. H-I; *see also* Schwartz Aff. ¶ 9, Ex. G at 78:5-10. Based on, among other things, Rosciti's common ownership and control of South Shore and Castle, U.S. Fire denied the claims asserted by Castle under the Earle Street Bond and Glendale Village Bond. *See* Schwartz Aff. ¶ 12, Ex. J.

## IV. ROSCITI'S COMMON OWNERSHIP AND CONTROL OF CASTLE AND SOUTH SHORE

As President and Treasurer of South Shore, Rosciti made the decision not to pay Castle the alleged balance due on the Earle Street Project and Glendale Village Project because Rosciti majority-owned and controlled the business operations of Castle. *See* Schwartz Aff. ¶ 5, Ex. C at 40:12-18, 41:1-10. Simultaneously, as President, Treasurer and majority-owner of Castle, Rosciti made a decision on behalf of Castle to continue to rent equipment to South Shore notwithstanding the large receivable because, according to Rosciti, "[i]t was easy not to pay me, basically." *See* Schwartz Aff. ¶ 5, Ex. C at 59:14-24.

The decision to continue to rent equipment to South Shore, however, was contrary to Castle's general practices for delinquent accounts. Daniel Clifford, Castle's vice president and minority-owner testified that it was Castle's policy to cease renting equipment to clients with aged receivables. *See* Schwartz Aff. ¶ 9, Ex. G at 31:3-11, 59:7-25, 60:1-25, 61:1-25. Despite

this policy, however, and the large receivable owed by South Shore to Castle and Rosciti's decision as President of South Shore not to pay Castle, Castle continued to rent equipment to South Shore based on Rosciti's ownership interest and control of both South Shore and Castle. *See* Schwartz Aff. ¶ 9, Ex. G at 72:25, 73:1-6, 78:11-24, 79:7-10.

## V. ROSCITI'S INDEMNITY OBLIGATIONS TO U.S. FIRE

In addition to Rosciti's role as President and Treasurer of South Shore and President and Treasurer of Castle, Rosciti is also a personal indemnitor to U.S. Fire under the Indemnity Agreement. Schwartz Aff. ¶ 3, Ex. A; *see also* Schwartz Aff. ¶ 4, Ex. B at 11 (Rosciti admitting execution of the Indemnity Agreement). Therefore, to the extent it is determined that U.S. Fire is required to pay Castle, Rosciti admits that he is obligated under the Indemnity Agreement to indemnify U.S. Fire. *See* Schwartz Aff. ¶ 5, Ex. C at 53:6-13, 61:18-22.

**STANDARD OF REVIEW**

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Buchanan v. Maine*, 469 F. 3d 158 (1st Cir. 2006) (citing Fed. R. Civ. P. 56(c)). In effecting such a review, the court must view the evidence in the light most favorable to the non-moving party. *Calvi v. Knox County*, 470 F. 3d 422 (1st Cir. 2006). In order to defeat summary judgment, however, the non-moving party must demonstrate, thorough submissions of evidentiary quality that a trial worthy issue persists. *Id.* Indeed, "a conglomeration of conclusory allegations, improbably inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden." *Id.*

## ARGUMENT

## POINT I

### CASTLE IS NOT A PROPER CLAIMANT UNDER THE PAYMENT BONDS ISSUED BY U.S. FIRE BECAUSE CASTLE IS MAJORITY-OWNED AND CONTROLLED BY ROSCITI, AN INDEMNITOR OF U.S. FIRE, WHO OWNS AND CONTROLS SOUTH SHORE

The payment bond claims asserted by Castle in this matter are governed by the public works bond statutes of Rhode Island and Massachusetts. *See* Mass. Gen. Laws 149 § 29; R.I. Gen. Laws § 37-12-1 *et seq.* Courts in Rhode Island and Massachusetts have not directly addressed the issue of whether a payment bond provides coverage to a corporation that is owned and controlled by the same individual who owns and controls the bond principal. The case law interpreting the Miller Act, 40 U.S.C. § 3133, the bond statute governing federal projects, however, has addressed the issue. These courts hold that a payment bond does not provide coverage to a corporation that is owned and controlled by the same individual who owns and controls the bond principal, and where that individual is a personal indemnitor of the bond principal to the payment bond surety.

### A. MILLER ACT PRECEDENT DOES NOT RECOGNIZE "INSIDERS" AS PROPER CLAIMANTS UNDER PAYMENT BONDS

Federal courts interpreting the Miller Act have routinely rejected payment bond claims asserted by partners, joint venturers, and "insiders" of the principal or those who are in the same "family" of entities owned by the principal. *See Hardaway v. Nat'l Sur. Co.*, 211 U.S. 552, 561 (1909); *U.S. ex rel Briggs v. Grubb*, 358 F.2d 508, 512 (9th Cir. 1966); *Theobald-Jansen Elec. Co. v. P.H. Meyer Co.*, 77 F.2d 27 (10th Cir. 1935); *U.S. ex rel Johnson Pugh Mech., Inc. v. Landmark Const. Corp.*, 318 F. Supp. 2d 1057 (D. Colo. 2004); *American Casualty Co. of Reading, PA v. Assiran*, 289 F.Supp. 645, 646 (D. Mass. 1968); *Nat'l State Bank of Newark v.*

*Terminal Const. Co.*, 217 F. Supp. 341, 361 (D.N.J. 1963); *U.S. ex rel Walker v. U.S. Fid. & Guar. Co.*, 4 F. Supp. 854, 855 (D. Wyo. 1933).

As the United States District Court for the District of Massachusetts has recognized:

> The purpose of a Miller Act bond is to protect those suppliers of labor and materials <u>who are not part of the family of the principal and who are . . . strangers dealing without opportunity for knowledge of the principal's resources</u> …

*Assiran*, 289 F.Supp. at 646. (emphasis added). Indeed, the rationale behind these cases is that a principal cannot recover on its own payment bond as the bond is for the benefit of subcontractors and suppliers. *See U.S. ex rel Briggs*, 358 F.2d at 512; *Fanderlik-Locke Co. v. U.S. ex rel Morgan*, 285 F.2d 939, 942 (10th Cir. 1960).

Other courts have recognized that to permit an insider of the principal to claim on a payment bond "would open the door to fraud of a serious type." *Walker*, 4 F. Supp. at 855. "If the rule were otherwise, then a contractor might agree to pay a brother contractor an unlimited compensation for doing the work the contractor was obligated to do, and by this devious method compel his own surety to pay a fabulous profit not covered by the bond." *Theobald-Jansen*, 77 F.2d at 29-30. "In sum, payment and performance bonds do not cover an entity controlled by the same person that controls the principal named in the bond or has otherwise agreed to indemnify the surety." *Johnson Pugh*, 318 F. Supp. 2d at 1073.

*Assiran* is particularly instructive. In that case, the surety filed an interpleader action to determine the validity of various claims upon a payment bond issued by the surety on behalf of the principal, Macon Construction. *Assiran*, 289 F. Supp. at 646. The principal's president was the sole owner of one claimant, an unincorporated proprietorship; and he had, among other things, formed and guided the second claimant. *Id.* The court held that the claims were barred

as not within the protection of the Miller Act because the claimants were controlled by the same individual who controlled the principal named in the bond. *Id.* at 647 (citations omitted).

Similarly, in *Johnson Pugh*, the dispute between a payment bond claimant and the surety involved "a web of companies" that where formed and owned by one of the indemnitors on the bond. 318 F. Supp. 2d at 1059. Shortly after taking on a federal project, the principal decided to replace its mechanical subcontractor. The indemnitor, who was involved in some fashion in directing the principal, then formed the plaintiff-claimant Johnson Pugh ("JP") to provide services on the project. *Id.* The surety argued that JP was an alter ego or insider of the principal because of the indemnitor's involvement in both companies. *Id.* at 1061, 1063.

After an extensive analysis of whether the plaintiff was a viable subcontractor or an alter ego of the principal, the court found that the Miller Act bonds at issue did not cover the plaintiff claimant because it was controlled by the indemnitor, who also controlled the principal and had agreed to indemnify the surety. *Id.* Specifically, the court noted that the indemnitor heavily influenced the claimant's major decisions, such as hiring and firing employees and making instructions regarding execution of subcontracts and payment requests. *Id.*

### B. CASTLE IS NOT A PROPER PAYMENT BOND CLAIMANT UNDER THE MILLER ACT BECAUSE ROSCITI HAD COMMON OWNERSHIP AND CONTROL OF BOTH CASTLE AND SOUTH SHORE AND ROSCITI IS A PERSONAL INDEMNITOR ON BEHALF OF SOUTH SHORE TO U.S. FIRE

Castle would not be permitted to recover as a payment bond claimant under the Miller Act because Rosciti had common ownership and control of both Castle and South Shore. The following facts are undisputed. Rosciti was an owner, President and Treasurer of South Shore and in that capacity controlled the business operations of South Shore. *See* Schwartz Aff., Ex. B at 5; *see also* Deposition Transcript of Rosciti, Schwartz Aff. ¶ 5, Ex. C. at 22:17-22, 60:18-20.

Rosciti's cousin, Henry Rosciti, Jr., the Vice President and the other owner of South Shore testified:

> Q: What was your position with South Shore in 2001? Did you have a title?
>
> A: I had a title. I was vice president … I didn't do anything in the office, I didn't do anything as far as company concerns, other than drive a truck. That's all.
>
> ***
>
> Q: And what were Anthony's responsibilities?
>
> A: Basically everything. He would run all the business end of it, office and management, hiring, firing, buying, selling.

*See* Deposition Transcript of Henry Rosciti, Jr., Schwartz Aff. ¶ 6, Ex. D at 8:13-18, 10:5-12. Rosciti was simultaneously the 70% majority-owner, President and Treasurer of Castle and in that capacity controlled the business operations of Castle. *See* Schwartz Aff. ¶ 4, Ex. B at 4-5; *see also* Schwartz Aff. ¶ 5, Ex. C. at 32:10-25, 33:1-5, 60:21-23.

It is further undisputed, that South Shore, controlled by Rosciti, did not pay Castle for equipment rental. As President and Treasurer of South Shore, Rosciti made the decision not to pay Castle the alleged balance due on the Earle Street Project and Glendale Village Project because Rosciti majority-owned and controlled the business operations of Castle. Rosciti testified:

> Q: Did there come a time when Castle had a large receivable that was owed by South Shore to Castle?
>
> A: Yes
>
> ***
>
> Q: Now, as president of South Shore, did you make a decision not to pay Castle for certain equipment rental?
>
> A: Yes
>
> Q: And why did you make that decision?

> A: Because I had other people banging on the door for money, and Castle was probably the easiest people not to pay.
>
> Q: And why would they be the easiest people not to pay?
>
> A: Because I own [Castle].

*See* Schwartz Aff. ¶ 5, Ex. C at 40:12-18, 41:1-10.

Similarly, it is undisputed that Castle, controlled by Rosciti, continued to rent equipment to South Shore without receiving payment for equipment rental. Rosciti, as President, Treasurer and majority-owner of Castle testified:

> Q: [A]s president of Castle Equipment, why did Castle Equipment let those 2005 invoices age to become such a large receivable?
>
> ***
>
> A: I think I answered your question before. It was easy not to pay me, basically.

*See* Schwartz Aff. ¶ 5, Ex. C at 59:14-24. Daniel Clifford, Castle's minority-owner, likewise, testified:

> Q: [B]efore South Shore filed for receivership, why did Castle continue to rent equipment to South Shore when there was a large receivable?
>
> A: I always thought we were going to get paid.
>
> Q: But is it fair to say that you never continued to rent equipment to any other client with a receivable that large?
>
> A: Yes.
>
> Q: So why was it different with South Shore then?
>
> A: Because of Anthony [Rosciti].
>
> ***

> Q: But you never had any other customer that had a receivable this large that you continued to rent equipment to?
>
> A: Not this large.

*See* Schwartz Aff. ¶ 9, Ex. G at 72:25, 73:1-6, 78:11-24, 79:7-10.

Incredibly, Rosciti, wearing both "hats" as president of Castle and as president of South Shore, and with control over both entities, submitted the payment bond claims to U.S. Fire on behalf of Castle for the alleged unpaid equipment rental due from South Shore on the Earle Street Project and Glendale Village Project. *See* Schwartz Aff. ¶ 5, Ex. C at 53:3-5. Rosciti submitted the payment bond claims on behalf of Castle notwithstanding the fact that Rosciti, as a personal indemnitor to U.S. Fire in connection with the bonds issued to South Shore, is obligated to indemnify U.S. Fire for any payments that U.S. Fire may be required to make to Castle for the alleged equipment rental unpaid by South Shore. *See* Schwartz Aff. ¶ 4, Ex. B at 11 (Rosciti admitting execution of the Indemnity Agreement); *see also* Schwartz Aff. ¶ 5, Ex. C at 53:6-13, 61:18-22 (Rosciti admitting obligation to indemnify U.S. Fire for any amounts paid to Castle).

Based on these undisputed facts, under the Miller Act precedent of *Assiran*, *Johnson Pugh*, *Walker* and *Theobald-Jansen*, Castle would be considered an "insider" and would not be permitted to recover as a payment bond claimant under the Miller Act. Rosciti controlled both South Shore and Castle and was an indemnitor on behalf of South Shore to U.S. Fire. Commentators have noted that payment bond claims by "insiders," like Castle here, have been rejected by the courts because:

> Some principals hire insiders as subcontractors. While some principals do this for legitimate business reasons, others do so for more nefarious purposes. In the event of the principal's default, the unpaid insider may seek relief from the surety. Generally, the surety's contractual and common-law indemnity rights discourage insiders from making such claims. The reasoning for this is relatively straightforward: if the insider recovers from the surety,

> the surety will seek indemnity from the principal. Because their financial interests are so aligned, the surety's payment to the insider will, for all practical purposes, be taken from the principal's own pocket, assuming that the surety can recover from the principal. However, the principals can avoid their indemnity obligations (that is, the principal may be judgment proof): an unscrupulous principal and its insider might obtain payment for the same work twice – once when the owner pays the principal and a second time when the surety reimburses the insider. Because payment bonds do not protect those acting in concert with the principal, courts consistently reject such claims, thereby avoiding such results.

*See* Schwartz Aff. ¶ 13, Ex. K, Keith G. Flanagan, *Can an Insider Recover Against its Owner Payment or Performance Bond? The Effect of the Principal's Proprietary Interest in the Claimant on the Surety's Payment and Performance Bond Liability*, American Bar Association, Fidelity & Surety Law Committee Newsletter (Summer 2006). Therefore, on the present summary judgment record, it is incontrovertible that Castle would not be a proper payment bond claimant under the Miller Act.

### C. RHODE ISLAND AND MASSACHUSETTS COURTS WOULD ADOPT THE MILLER ACT PRECEDENT ON "INSIDER" CLAIMS BECAUSE THE PUBLIC WORKS BOND STATUTES IN THOSE STATES ARE MODELED AFTER THE MILLER ACT AND THE COURTS IN THOSE STATES LOOK TO THE MILLER ACT FOR GUIDANCE

The Rhode Island and Massachusetts bond statutes are both modeled after the Miller Act and courts in both states routinely look to cases interpreting the Miller Act for guidance.[1] *See First National Ins. Co. of America v. Commonwealth of Mass.*, 391 Mass. 321, 324, 461 N.E.2d 789 (1984) (applying Massachusetts law holding "[w]e are guided by numerous Federal decisions which have applied the Federal performance and payment bond statute, the Miller

---

[1] Castle will likely cite to the cases of *Cleveland Wrecking Co. v. Nova Casualty Co.*, 2001 WL 1823604 (W.D.N.Y. 2001) or *National Union Fire Ins. Co. of Pittsburgh, PA v. Electric Transit*, 2007 WL 735766 (N.D.Cal.,2007). However, these cases are legally and factually distinguishable from this matter and do not involve the application of Rhode Island or Massachusetts law.

Act."); *M. Lasden, Inc. v. Decker Elec. Corp.*, 372 Mass. 179, 183, 360 N.E.2d 1068 (1977) (applying Massachusetts law and recognizing the Miller Act as the "federal counterpart to [Mass. Gen. Laws 149] § 29" and relying on interpretive case law to determine coverage under payment bond); *Sims Corp. v. The Hartford Acc. & Indem. Co.*, 1979 WL 195994, *1 (R.I. Super. Ct. 1979) (applying Rhode Island law and holding "[s]ince § 37-12-1 *et seq* is modeled after the federal statute known as the Miller Act . . . an analysis of decisions under this Act is helpful."); *Koury Steel Erection v. United Iron Works, Inc.*, 1975 WL 169980 (R.I. Super. Ct. 1975) (recognizing that Rhode Island bond statute "is based upon and substantially identical to [the Miller Act] and that "construction given the Miller Act by the federal courts furnish guidance."). Given the similarities between the Miller Act and the Massachusetts and Rhode Island public works bond statutes, and the fact that Rhode Island and Massachusetts look to the Miller Act for guidance, courts in Rhode Island and Massachusetts would follow the reasoning and holding of the Miller Act cases and reject the claims of "insiders" on their respective public works payment bonds. *Duteau v. Salvucci*, 330 Mass. 531, 535, 115 N.E.2d 726 (1953). ("The remedy created by [the public works bonding] statute does not extend to the general contractor. He needs no such remedy as he deals directly with the Commonwealth to which he may look for payment."); *Bethlehem Rebar Industries, Inc., v. Fidelity and Deposit Co. of Maryland*, 582 A.2d 442, 444 (R.I. 1990) (" The purpose addressed in § 37-12-1 is to ensure that *materialmen* on state construction projects get paid. . .") (emphasis added). Accordingly, courts in Rhode Island and Massachusetts would follow the Miller Act precedent in finding that Castle's "insider" payment bond claims are improper.

## CONCLUSION

For the foregoing reasons, U.S. Fire respectfully requests that this Court grant its motion for summary judgment.

UNITED STATES FIRE INSURANCE COMPANY,

Defendant/Third-party Plaintiff,
By its Attorneys,

/s/ Stephen J. Brouillard
Stephen J. Brouillard, Esq. # 6284
Orson and Brusini Ltd.
325 Angell Street
Providence, RI 02906
Tel.: (401) 223-2100
Fax: (401) 861-3103
Email: sbrouillard@orsonandbrusini.com

/s/ Adam R. Schwartz
Adam R. Schwartz, Esq., *pro hac vice*
Christopher E. Kunkel, Esq., *pro hac vice*
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
Morristown, NJ 07962
Tel.: (973) 993-8100
Fax: (973) 425-0161
Email: aschwartz@mdmc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2008 this document has been filed electronically with the Court, is available for viewing and downloading from the ECF system, and has been served by first class mail, postage prepaid, on the following individuals:

/s/ Stephen J. Brouillard