UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CASTLE EQUIPMENT COMPANY,
Plaintiff

vs. C.A. NO.: 07-98S

UNITED STATES FIRE INSURANCE COMPANY,
Defendant/Third-Party Plaintiff

vs.

ANTHONY F. ROSCITI, JR.,
Third-Party Defendant

DEPOSITION OF DANIEL CLIFFORD,

in the above-entitled cause, taken on behalf of the Defendant, United States Fire Insurance Company, pursuant to notice, before Jane F. Cormier, CSR, a Notary Public in and for the State of Rhode Island, at the offices of Orson & Brusini, 325 Angell Street, Providence, Rhode Island, on Thursday, June 5, 2008, convening at 10:00 a.m.

Allied Court Reporters, Inc.
115 Phenix Avenue
Cranston, Rhode Island 02920
(401) 946-5500

A P P E A R A N C E S

FOR THE PLAINTIFF...... LEPIZZERA-LAPROCINA, LTD.
BY: SCOTT K. DEMELLO, ESQ.

FOR U.S. FIRE INSURANCE..McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
BY: ADAM R. SCHWARTZ, ESQ.
BY: CHRISTOPHER KUNKEL, ESQ.
ORSON AND BRUSINI, LTD.
BY: STEPHEN J. BROUILLARD, ESQ.

FOR THE DEFENDANT...... FERRUCCI RUSSO, P.C.
BY: MOSHE S. BERMAN, ESQ.

A. Vice president.
Q. And how long have you been vice president?
A. Since we started.
MR. SCHWARTZ: I'm going to mark as the next exhibit, Anthony F. Rosciti, Jr.'s Answers to United States Fire Insurance Company's Answers to Interrogatories.
(DEFENDANT'S EXHIBIT 3 MARKED FOR IDENTIFICATION)
Q. And I'm handing those to you. Could you please just take a look at page four.
A. Okay.
Q. And I'm looking at interrogatory three, number six, that asks for, among other things, the nature and scope of certain persons at Castle.
A. Um-hmm.
Q. And then in the answer to that number six, and these interrogatories signed by Anthony, they were not signed by you.
A. Okay.
Q. And in the answer to interrogatory number six, it says, Clifford is responsible for conducting the day-to-day sales, leases and rental activities of Castle. Do you see that?
A. Yes, sir.
Q. Do you agree that that's your responsibilities at

Castle?
A. Yes.
Q. And then it goes on to say I, meaning Anthony Rosciti, and then it says, open quote, head, close quote, the business from an operations perspective, and further conduct sales, leasing and rental activities on an as-needed basis. Would you agree that that represents the scope or the responsibilities of Anthony Rosciti at Castle?
A. Yes.
Q. I know you've brought some documents, and I see some of them contain some payroll information, but let me just ask you, and I'm not looking for the exact number, if you don't know it, but I want to get a sense of what your salary was and Anthony's salary was for a number of years. So, I'm going to ask you, in 2004 what was your salary from Castle?
A. Zero.
Q. Did you make any other income in 2004?
A. No. The company didn't start, we incorporated in 2004, I believe it was, but we didn't start operations until 2005 until I left my former employer.
Q. Did Anthony have any income, as far as you know, from Castle?

trying to think of the right term. Per case, I guess.
Q. Has there ever been a situation where Castle stopped renting to a client because they weren't paying?
A. Yes.
Q. And who was that? Which client?
A. AJ Construction is one. General Excavating would be another. I mean, there's a few. ROC Construction, R-O-C, Construction. Bill Ray Demolition. Those are just ones that come to the top of my head.
Q. What was that last name?
A. BillRay. B-I-L, I think it's hyphen, R-A-Y, demolition.
MR. SCHWARTZ: I'm going to hand you a stack of equipment rental agreements that we'll mark as the next exhibit.
(PLAINTIFF'S EXHIBIT 5 MARKED FOR IDENTIFICATION)
Q. Could you please take a look at Exhibit 5.
A. Um-hmm.
Q. Do you recognize your name at the bottom, left corner on each of these rentals agreements.
A. Yes.
Q. Is that your signature?
A. It's not my signature, but yeah, it's my

Supply, Inc., Receivables Open as of Fiscal Period 26 December, 2006?
A. Um-hmm.
Q. And it has a date on it of 6-20-07 at 2:29 p.m. Do you see that up in the corner there?
A. Yes. What page?
Q. If you could take a look at page three, there's a reference to General Excavating.
A. Oh, yeah.
Q. And it says that the combined receivable from General Excavating is $7,554. Do you see that?
A. Yes it's broken off up there, but yeah.
Q. Are we missing something?
A. No. I'm sorry.
Q. Do you see that?
A. Yes, I do.
Q. And is this the general Excavating that you mentioned that you don't rent equipment to anymore?
A. Yes.
Q. And is it fair to say they haven't paid the $7,554 receivable shown here?
A. Yes.
Q. Staying there, looking at the General Excavating entry, it as an invoice due date of 12-6-06. Do you see that?

A. Yes.
Q. Is it fair to say that after 12-6-06 you didn't rent General Excavating any more equipment?
A. Yes.
Q. If you look at page five of this Exhibit 7, it says ROC Construction.
A. Oh, yeah.
Q. And there's a reference, shows a receivable of $3,210.
A. Yes.
Q. Did ROC ever pay that amount?
A. No.
Q. And is it fair to say that after 1-9-06 the due date for that payment that Castle didn't rent ROC any more equipment?
A. That's correct.
Q. Do you see a BillRay entity that you mentioned anywhere on here? I'm not sure how you spell it.
A. No. I don't see them on here.
Q. Looking at the same document, there's a prior receivable, Open Summary Sheet, that says Year End 2005. You have to turn back now. It's, I'm looking at page one of that. There is an entry there for BillRay Demolition, it's B-I-L-L-R-A-Y, one word, Demolition. And is this the BillRay that you had

mentioned before that you don't rent, Castle does not rent equipment to anymore?
A. Yes.
Q. And has Castle ever been paid the receivable of $27,170 identified in this?
A. I don't believe all of it, but we've been paid, I don't know if it was most of it or so, but we've been paid.
Q. Well, it appears to be taken off?
A. Yeah.
Q. I'm not sure how this works, but I think the other receivable report we were looking at before says --
A. It probably was paid, so it was taken off.
Q. But is it fair to say that after 8-30-05, which was a due date for the last payment shown on here for BillRay to pay Castle, that after that due date, Castle didn't rent any more equipment to BillRay?
A. That's correct.
Q. I see AJ Construction is there, too. We talked about them before.
A. Yup.
Q. And that shows a receivable of $67,443.
A. Yes.
Q. Has that been paid?
A. No.

by those two as of that day?
A. From them?
Q. From them.
A. I'm not aware, no.
Q. Do you know if a collection agency was ever assigned by Castle to collect a debt owed by South Shore to Castle related to the New Bedford and Burrillville jobs?
A. I've never heard of one.
Q. Do you know why a collection agency was not retained by Castle to pursue the debt owed by South Shore to Castle on the New Bedford and Burrillville jobs?
A. I don't know why.
Q. Who would make that decision?
A. Guessing Anthony would, because he's the president.
Q. Besides the emails that we looked at in Exhibit 6, do you know of any other letters written from Castle to South Shore to try to collect on monies that South Shore owed Castle in connection with the Burrillville and New Bedford jobs?
A. It was strictly mostly verbal with me and Anthony talking about it continuously about getting money for Castle.
Q. Who made the decision to continue renting equipment

to South Shore when South Shore had a large receivable owed to Castle?

A. I guess it was both me and Anthony.

Q. And Anthony was the seventy percent shareholder in the company at the time you made that decision?

A. Yes.

MR. SCHWARTZ: We'll mark as Exhibit 10 another composite exhibit, which is a proof of claim from Castle, a proof of claim form executed by Castle. Can you take a second, please, and just flip through and look at that.

(PLAINTIFF'S EXHIBIT 10 MARKED FOR IDENTIFICATION)

Q. Have you ever seen the first page of Exhibit 10, this document entitled proof of claim? Have you ever seen that?

A. Just this morning.

Q. I see the document at least contains a signature of Anthony Rosciti.

A. Yes.

Q. Were you involved in the preparation of this proof of claim at the time Anthony signed it?

A. Yes.

Q. And why did Anthony sign this proof of claim?

A. I'm assuming because he was the president, but I don't really know anything other than that.

A. Oh, yeah.
Q. They weren't extremely low, and they weren't extremely high?
A. No. They were market.
Q. The receivable that South Shore owed, let me rephrase that. I think it's been your testimony that the receivable due Castle from South Shore for the New Bedford and Burrillville project that's the subject of this lawsuit is approximately 320,000.
A. I think that's what we talked about.
Q. Did you ever, before South Shore filed for receivership, why did Castle continue to rent equipment to South Shore when there was a large receivable?
A. I always thought we were going to get paid.
Q. But is it fair to say that you never continued to rent equipment to any other client with a receivable that large?
A. Yes.
Q. So, why was it different with South Shore then?
A. Because of Anthony. And again, we had meetings all the time, and we'd always, we're gonna get paid. That was the whole thing, Castle was gonna get paid, with all this equipment going out.
Q. So, you met with Anthony at a time when there was a

large receivable?
A. All the time.
Q. And what did you say to Anthony?
A. When are we gonna see the money.
Q. And what did Anthony say to you?
A. It's coming.
Q. But you never had any other customer that had a receivable this large that you continued to rent equipment to?
A. Not this large.
MR. SCHWARTZ: Why don't we take a few minutes break.
(A short break was taken.)
Q. Mr. Clifford, I think you testified that besides this New Bedford project we talk about, and the Burrillville project, there's some other projects that, in connection with South Shore owes Castle for equipment rental, is Castle doing anything to try to collect on those projects from South Shore?
A. Not yet.
Q. When you say not yet, is there a plan that Castle has to try to collect?
A. Not yet.
Q. Well, what do you think Castle is going to do?
A. Don't know.

CERTIFICATE

I do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of the Court, especially, but without restriction thereto, under Rule 30 of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

I further certify that neither the deponent nor any party requested a review of the transcript.

IN WITNESS WHEREOF I have hereunto set my hand this 12th day of June, 2008.



JANE F. CORMIER, CSR
NOTARY PUBLIC
MY COMMISSION EXPIRES: 1/19/2010