Exhibit "C"



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CASTLE EQUIPMENT COMPANY,
Plaintiff

vs. C.A. NO.: 07-98S

UNITED STATES FIRE INSURANCE COMPANY,
Defendant/Third-Party Plaintiff

vs.

ANTHONY F. ROSCITI, JR.,
Third-Party Defendant

DEPOSITION OF DANIEL CLIFFORD,

in the above-entitled cause, taken on behalf of the Defendant, United States Fire Insurance Company, pursuant to notice, before Jane F. Cormier, CSR, a Notary Public in and for the State of Rhode Island, at the offices of Orson & Brusini, 325 Angell Street, Providence, Rhode Island, on Thursday, June 5, 2008, convening at 10:00 a.m.

Allied Court Reporters, Inc.
115 Phenix Avenue
Cranston, Rhode Island 02920
(401) 946-5500

A. I don't know.
Q. How about 2005, what was your income from Castle?
A. I believe about $60,000 for the full year.
Q. And do you know what Anthony's was?
A. I don't.
Q. And why don't you know that?
A. Just never got into it. It was never, he told me that he never took a salary. That's what he told me. So, I never checked to see if he did, I just believed him.
Q. Was Anthony responsible for setting the salaries, setting your salary?
A. Yes and no. We discussed it.
Q. But would he be the ultimate decision-maker on what your salary would be after that discussion?
A. Like I said, it was more a discussion, it wasn't more like, okay, yes, no. But I guess yes, if you want to, you know.
Q. Well, let me ask the question, sort of the other side of the coin?
A. Sure.
Q. Did you set Anthony's salary at the company, at Castle?
A. Did I set it?
Q. Yes. At any year?

A. No.
Q. So, Anthony would establish his own salary, whatever that would be at Castle; is that fair to say?
A. Yes.
Q. And how about for the other staff, who sets the salary for the other staff?
A. We both talked about it, as far as what was other people in the other positions in the industry were making, like the mechanics, and the gentlemen, the people working in the office, what their responsibility is, what they make, and things like that.
Q. Are there other salespeople in the office?
A. There has been, but right now there's not, there's just me.
Q. So, I think I asked you what your salary was in 2005.
A. Yes.
Q. How about in 2006?
A. It was $100,000.
Q. And do you know what Anthony's salary was in 2006?
A. Again, no, I don't. But I don't think he took a salary, from what he said.
Q. And then, how about in 2007?
A. Right around the same, right around $100,000 or

rentals. Is this the same as the prior emails that it's you telling Chad which equipment was used, which of Castle's equipment was used by South Shore in June? Is that what you're doing?
A. Yes.
Q. And it's your testimony that there should be rental agreements for those pieces of equipment on these projects?
A. Yes.
Q. Do those records exist? Is there like a file of rental agreements at Castle where those rental agreements would be maintained by Castle?
A. There should be.
MR. SCHWARTZ: I'm going to hand you another exhibit to take a look at. I guess it was produced to us as a composite of documents. The first page says Castle Equipment and Supply, Inc., Balance Sheet, 12-31-05. We'll mark that as the next exhibit, seven.
(DEFENDANT'S EXHIBIT 7 MARKED FOR IDENTIFICATION)
Q. Have you ever seen the documents attached to Exhibit 7? Are they familiar to you?
A. Yes.
Q. If you could turn to, in the back of Exhibit 7, there's a document entitled Castle Equipment and

Supply, Inc., Receivables Open as of Fiscal Period 26 December, 2006?
A. Um-hmm.
Q. And it has a date on it of 6-20-07 at 2:29 p.m. Do you see that up in the corner there?
A. Yes. What page?
Q. If you could take a look at page three, there's a reference to General Excavating.
A. Oh, yeah.
Q. And it says that the combined receivable from General Excavating is $7,554. Do you see that?
A. Yes it's broken off up there, but yeah.
Q. Are we missing something?
A. No. I'm sorry.
Q. Do you see that?
A. Yes, I do.
Q. And is this the general Excavating that you mentioned that you don't rent equipment to anymore?
A. Yes.
Q. And is it fair to say they haven't paid the $7,554 receivable shown here?
A. Yes.
Q. Staying there, looking at the General Excavating entry, it as an invoice due date of 12-6-06. Do you see that?

A. Yes.
Q. Is it fair to say that after 12-6-06 you didn't rent General Excavating any more equipment?
A. Yes.
Q. If you look at page five of this Exhibit 7, it says ROC Construction.
A. Oh, yeah.
Q. And there's a reference, shows a receivable of $3,210.
A. Yes.
Q. Did ROC ever pay that amount?
A. No.
Q. And is it fair to say that after 1-9-06 the due date for that payment that Castle didn't rent ROC any more equipment?
A. That's correct.
Q. Do you see a BillRay entity that you mentioned anywhere on here? I'm not sure how you spell it.
A. No. I don't see them on here.
Q. Looking at the same document, there's a prior receivable, Open Summary Sheet, that says Year End 2005. You have to turn back now. It's, I'm looking at page one of that. There is an entry there for BillRay Demolition, it's B-I-L-L-R-A-Y, one word, Demolition. And is this the BillRay that you had

mentioned before that you don't rent, Castle does not rent equipment to anymore?

A. Yes.

Q. And has Castle ever been paid the receivable of $27,170 identified in this?

A. I don't believe all of it, but we've been paid, I don't know if it was most of it or so, but we've been paid.

Q. Well, it appears to be taken off?

A. Yeah.

Q. I'm not sure how this works, but I think the other receivable report we were looking at before says --

A. It probably was paid, so it was taken off.

Q. But is it fair to say that after 8-30-05, which was a due date for the last payment shown on here for BillRay to pay Castle, that after that due date, Castle didn't rent any more equipment to BillRay?

A. That's correct.

Q. I see AJ Construction is there, too. We talked about them before.

A. Yup.

Q. And that shows a receivable of $67,443.

A. Yes.

Q. Has that been paid?

A. No.